UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


William P. Trainor


     v.                           Civil No. 07-cv-352-JD
                                           Opinion No. 2008 DNH 128


United States of America


### O R D E R

William Trainor, proceeding pro se, has moved under 28 U.S.C. § 2255 for collateral relief from his convictions and sentence in this court for conspiracy to commit wire fraud under 18 U.S.C. § 373 and multiple counts of wire fraud under 18 U.S.C. § 1843.  The convictions, which arose out of Trainor's fraudulent dealings in two pieces of real estate in Lebanon, Maine, were upheld on appeal.  See United States v. Trainor, 477 F.3d 24 (1st Cir. 2007).  For the foregoing reasons, the court denies Trainor's motion without an evidentiary hearing.


### Background

The facts adduced at Trainor's trial are set forth in detail in the opinion by the court of appeals, 477 F.3d at 27-30, and therefore will be repeated here only as necessary to resolve Trainor's present claims.  Trainor and two co-defendants, John DesMarais and Donald Smith, were indicted for fraudulently

obtaining two loans, one to finance DesMarais's purchase of a parcel held by Trainor's wife, at 12 Trainor Road, and the other to finance the construction of a house on a parcel transferred to Smith by Trainor, at 16 Trainor Road.  All three men were charged, in one count, with an overarching conspiracy to defraud; Trainor and DesMarais were charged with three counts of wire fraud for their role in obtaining the loan on 12 Trainor Road; and all three men were charged with four counts of wire fraud for their role in obtaining the loan on 16 Trainor Road.[1]  DesMarais and Smith each pled guilty to one of the wire fraud counts before trial, where they testified against Trainor.  At trial, Trainor was represented by two experienced criminal defense attorneys who had been appointed by the court.

Trainor's collateral attack on his convictions focuses largely on those for wire fraud arising out of his dealings in 16 Trainor Road.[2]  Before securing the construction loan on that

---

[1]Two of these counts, numbered seven and eight in the indictment, were dismissed at the close of the government's case at trial due to insufficient evidence to sustain a conviction. See Fed. R. Crim. P. 29(a).

[2]In one of his allegations of perjury, Trainor claims that Leslie Ogden, who served as the title company's closing attorney on the mortgage loan for 12 Trainor Road, testified falsely "that she never looked at the $75,000 check presented by" Trainor at the closing as part of DesMarais's down payment on the property. The truth, Trainor says, is that Ogden herself asked him "if he had a check on his person" after he had explained that DesMarais

parcel, Trainor had arranged for its transfer to a Las Vegas attorney, James Lee, for what he described as the purpose of settling a debt Lee was owed by one of his clients, Robert Jones, who was in turn owed money by Trainor.  Jones, who was called as a witness for the defense, confirmed this understanding, testifying that he had approached Trainor for help with the debt to Lee because Trainor "had come to owe [Jones] quite a little bit of money over the years," about several million dollars.

But Jones was not asked about the circumstances giving rise to Trainor's debt to him due to defense counsel's concern, shared by the court, that doing so would open the door to evidence of Trainor's prior bad acts.  These included Trainor's inducing Jones to invest in a company controlled in part by Trainor, diverting those monies to his own personal benefit, then failing to pay tax on that income--all of which Trainor admitted to doing when he pled guilty to tax evasion in another case after being convicted in this one.  See Plea Agreement, United States v. Trainor, No. 01-6215-CR (S.D. Fla. Apr. 14, 2005).[3]  Lee did

---

had been unable to obtain all of the money needed for the down payment, and that the lender's representative gave his assent. Trainor provides no support at all for this version of events. Indeed, the only evidence he does reference, Ogden's statement to federal investigators, is consistent with her trial testimony.

[3]Trainor subsequently moved to vacate this conviction, but the motion was denied by the district court, which also denied

testify, on cross-examination by defense counsel, that he did not believe that Trainor, who owed Jones "in excess of seven million dollars," would be realizing any profit from the transfer of 16 Trainor Road, "particularly because of the way that Mr. Trainor had got the seven million dollars."[4]  But Lee was never asked to elaborate on this comment, and it was not brought up again, either in the testimony of any other witness or counsel's arguments to the jury.

To effect the transfer of 16 Trainor Road to Lee, Trainor prepared a warranty deed conveying the property from his son, the record owner, to Lee's law practice in fee simple.  After a title company in Portsmouth, New Hampshire, placed this instrument on file with the registry of deeds, the company sent Trainor a fax notifying him that this had occurred.  This transmission was the

---

him a certificate of appealability.  The Court of Appeals for the Eleventh Circuit followed suit; the Supreme Court then denied Trainor's petition for a writ of certiorari.

[4]Lee and Jones testified as to different understandings of the fate of any proceeds from the eventual sale of 16 Trainor Road.  Lee, referencing an undated letter agreement with Jones, understood that the two of them would split those profits, with Lee's portion going to a retainer to fund Jones's future legal fees.  But Jones, referencing an e-mail he said he sent to Trainor with Lee's assent, understood that Jones and Trainor would split the profits.  Both the letter and the e-mail were put in evidence.

basis of count five of the indictment, one of the wire fraud charges on which Trainor was convicted.

Trainor subsequently prepared a "Lien Certificate," which he alone signed in his purported capacity as "agent for the parties," attesting to "funding conditions" on the transfer of the property to Lee, including a payment to Donald Walden, whom would later be falsely portrayed as the source of financing for Smith's purchase of 16 Trainor Road. Lee testified that he did not learn of either the "Lien Certificate" or the alleged obligations it referenced until some time after taking title to 16 Trainor Road, when the certificate was discovered on file in the registry amid Lee's attempts to sell the property.

By that time, Trainor had prepared another document entitled "Release of Lien" that recited the same "funding obligations" as the "Lien Certificate," adding that because they "were not paid in accordance with the agreement between the parties . . . the deed is rescinded in accordance with the agreement between the parties and deeded back to" Trainor's son. Trainor also prepared another deed conveying the property from Lee's practice back to Trainor's son, signed by Trainor, again, in his purported capacity as Lee's agent. Lee testified that he had not seen these documents until after he became embroiled in a dispute with Smith over title to the property, that Trainor had never notified

Lee that the deed was being rescinded due to unpaid obligations, and that Lee had never authorized Trainor to act as his agent.

Contemporaneously with his preparation of the "Release of Lien" and deed from Lee's office to Trainor's son, Trainor also prepared a purchase and sale agreement and deed transferring 16 Trainor Road to Smith.  At Trainor's suggestion, DesMarais, who had fallen behind on his mortgage payments on 12 Trainor Road, approached Smith, a builder, with a plan to develop 16 Trainor Road.  The particulars of the deal changed over time, but eventually it was agreed that Smith, having bought the property, would finance the construction of a custom home there via a bank loan obtained with Trainor's help, and that DesMarais would receive a $10,000 finder's fee out of the loan proceeds.  Smith testified that someone he knew only as "Carol," who was the girlfriend of Smith's friend Bill Ewell, also planned to invest $20,000 in the development of the property at some point, but backed out; Trainor said she would be repaid.

On its face, the purchase and sale agreement obligated Smith to pay $250,000, with $50,000 down, but he and Trainor had agreed beforehand that the price was actually only $130,000, with nothing down--Smith was to give Trainor $20,000, but it would be refunded once Trainor obtained a loan secured by the parcel. Trainor also granted Walden a $200,000 mortgage on the parcel as

"security" for his investment in one of Trainor's businesses, accompanied by a promissory note in that amount from Smith to Walden, though Smith testified that he never expected to make any payments on note because it "would be taken care of" once he obtained financing for the property.  These documents allowed Smith to seek a $400,000 construction loan from a bank, with half the proceeds going to repay Walden's "mortgage" and the other half going to build a house on the parcel.

But the bank would not make the loan unless Smith paid the full $50,000 down payment on the parcel due under the purchase and sale agreement.  So, to make up for the $30,000 shortfall, Trainor suggested that Smith sell an easement in the property to DesMarais, who owned the nearby 12 Trainor Road lot.  DesMarais testified, however, that he never signed the memorandum, later submitted to the bank, evincing his agreement to buy the easement and that, in fact, the memorandum misspelled his name.  And Smith testified that he had no expectation of receiving $30,000 from DesMarais for the easement.  The bank, none the wiser as to this and other unfavorable aspects of the deal from its perspective, including the actual purchase price and the nature of Walden's mortgage, agreed to make the construction loan as requested.

During the processing of the loan, the registry of deeds in Maine faxed a copy of Smith's deed for 16 Trainor Road, along

with other documents, to the same title company in Portsmouth that had handled the transfer of the property to Lee (who, again, remained very much unaware that his land had been transferred to and was being encumbered by someone else). This transmission was the basis of count six of the indictment, another of the wire fraud charges on which Trainor was convicted. At Trainor's direction, Walden told the bank how to distribute the $200,000 purportedly due under his mortgage, including five separate checks to Trainor totaling $91,700, with the balance going to Walden. Smith testified that Trainor gave him one of these checks, for $20,000, to refund the down payment on the property, as agreed. Trainor now claims that this money was actually intended to reimburse "Carol" for her $20,000 initial investment, but Smith flatly denied that when asked about it at trial.[5]

Shortly after the construction loan closed, Smith was contacted by Lee, who claimed to be the rightful owner of the 16

---

[5]Trainor claims this testimony was false in light of a "partnership agreement." This agreement, however, merely purports to assign the "right" to purchase 16 Trainor Road from the partnership to Smith, while reserving the partnership's right to "profits generated from the sale of the residence to be constructed there." It is not a "partnership agreement" in that it does not set forth the respective rights and duties of the partners or, indeed, even identify them. Moreover, it does not so much as mention "Carol," let alone reflect any right she had to the proceeds of the construction loan.

Trainor Road property.  Lee also confronted his client, Jones, about the transfer of the parcel, leading Jones to call Trainor for an explanation.  According to Jones, Trainor explained that he re-transferred the property because of outstanding taxes--not because, as Trainor now suggests, he did not in fact owe Jones any money.  Defense counsel focused on the claimed non-payment of taxes in his cross-examination of Lee, getting him to admit that he was unaware of any real estate transfer tax on the transaction and that he did not know whether the other real estate taxes on the parcel had been paid.

Lee also testified to a phone call from Trainor in which he acknowledged that Lee was upset about the unauthorized transfer of the property and offered to attempt to resolve the matter. During this call, Trainor defended his actions by pointing out that he had never actually signed Lee's name to anything, but, significantly, did not say that he was entitled to re-transfer the property back to his son because the debt underlying the original transfer was invalid.  Indeed, according to Lee's account, Trainor did not dispute the underlying debt at all.  The call ended when Trainor hung up after Lee accused him of fraud. Lee's next call was to the authorities.

## **Standard of Review**

Under 28 U.S.C. § 2255, a prisoner serving a sentence
imposed by a federal court who is

> claiming the right to be released upon the ground that
> the sentence was imposed in violation of the laws of
> the Constitution or laws of the United States, or that
> the court was without jurisdiction to impose such
> sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to
> collateral attack, may move the court which imposed the
> sentence to vacate, set aside or correct the sentence.

"A petitioner who invokes section 2255 is not entitled to an
evidentiary hearing as a matter of right." David v. United
States, 134 F.3d 470, 477 (1st Cir. 1998).  In particular, no
hearing is necessary when the petitioner's allegations state
conclusions instead of facts, contradict the record, are
inherently incredible, or do not entitle him to relief even if
they are true.  Owens v. United States, 483 F.3d 48, 57 (1st Cir.
2007).  As fully explained infra, because Trainor's claims fit
this description, his motion is denied without a hearing.


## **Discussion**

Trainor claims that: (1) the government failed to prove
counts five and six, (2) certain government witnesses perjured
themselves at trial, (3) the court erred in imposing restitution
as part of his sentence, and (4) he received ineffective

10

assistance of counsel in preparing for and conducting his defense at trial.  In response, the government argues that Trainor cannot raise any of these claims but ineffective assistance in this collateral proceeding because he failed to raise them on direct review and, furthermore, that Trainor cannot challenge the restitution order under § 2255.  The government also argues that all of the claims, including those based on ineffective assistance of counsel, are without merit.  The court will consider the government's procedural arguments first.

## I.    **Procedural Default and Other Limitations on § 2255**

Because a petitioner challenging restitution obligations imposed as part of a sentence is not "claiming the right to be released," the First Circuit has held that § 2255 does not authorize collateral attacks on restitution orders.  Smullen v. United States, 94 F.3d 20, 25-26 (1st Cir. 1996); see also, e.g., Kaminski v. United States, 339 F.3d 84, 85 (2d Cir. 2003); Barnickel v. United States, 113 F.3d 704, 706 (7th Cir. 1997). So Trainor cannot challenge the restitution order here.[6]  That

---

[6]Given this limitation, the circuit has recognized that a restitution order can be collaterally attacked by a petition for writ of error coram nobis.  United States v. Barrett, 178 F.3d 34, 56 n.20 (1st Cir. 1999).  To obtain this extraordinary form of relief, however, a petitioner must explain, among other things, why he did not exploit other avenues of attack, including

claim can therefore be dismissed without the need for an
evidentiary hearing.  See Hager, 993 F.2d at 5.

Section 2255 also "is not a substitute for a direct appeal"
from the sentence or the conviction supporting it.  Knight v.
United States, 37 F.3d 769, 772 (1st Cir. 1994).  So a court
generally cannot entertain, under § 2255, challenges to a
conviction or sentence that were not raised on direct appeal
unless the petitioner shows both "cause" for failing to do and
"prejudice" as a result, or that he is actually innocent.  Owens
v. United States, 483 F.3d 48, 56–57 & n.6 (1st Cir. 2007).  This
rule is known as "procedural default."  Id.  An exception to the
rule, however, is a claim of ineffective assistance of counsel,
which normally cannot be raised on direct appeal and must
therefore await review on a collateral attack under § 2255.
Massaro v. United States, 538 U.S. 500, 504 (2003).

The government argues that, by failing to raise any of his
present claims for relief in his direct appeal from his
convictions, Trainor has procedurally defaulted all of them
except insofar as they allege ineffective assistance of counsel.

---

direct appeal.  Hager v. United States, 993 F.2d 4, 5 (1st Cir.
1993).  Trainor has made no attempt to do so.  See infra.  It
should also be noted that, in entering into a plea agreement to
resolve the charges against him in the Southern District of
Florida, Trainor waived his right to appeal his sentence in this
case as well as that one.

To receive collateral review of these claims, then, Trainor bears the burden of excusing his procedural default, by showing, as just mentioned, either cause and prejudice or actual innocence. See Derman v. United States, 298 F.3d 34, 45 (1st Cir. 2002).

Trainor does not attempt to show cause for the omission of these claims from his direct appeal, and none is apparent from the record.[7]  Indeed, while constitutionally ineffective assistance of counsel in failing to raise a claim can constitute cause, see Murray v. Carrier, 477 U.S. 478, 488 (1986), Trainor's several complaints of omissions by his trial attorneys do not extend to any of the defaulted claims, and he has made no allegation at all of ineffective assistance by appellate counsel.

Trainor has also failed to show prejudice from his failure to raise these claims earlier, because they are without merit:

(1)  Trainor's claim that the government failed to adduce sufficient evidence of counts five and six depends entirely on his view that the transmissions in question were alleged to have come from (count five) or gone to (count six) a title company in

---

[7]There is no indication, for example, that the testimony came to appear false only in light of evidence acquired since trial; to the contrary, Trainor argues that the witnesses committed perjury based on purported inconsistencies between their testimony and other evidence received at trial.  There could be no cause, then, for failing to raise the claim earlier. See Magee v. Harshbarger, 16 F.3d 469, 472 (1st Cir. 1994).

Stratham, New Hampshire, while the evidence at trial showed that
the title company was actually located in nearby Portsmouth.
This view is mistaken.  Leaving aside how a variance on such a
minor detail could possibly have prejudiced Trainor's defense,
see United States v. Escobar-de Jesus, 187 F.3d 148, 172 (1st
Cir. 1999) (finding no prejudicial variance between charge that
offense occurred in Guayama, Puerto Rico, and proof that it
occurred in Guánica, Puerto Rico), there was no variance anyway.
Before trial, the government successfully moved to strike from
the indictment, as surplusage, the designation of Stratham as the
place of the title company in counts five and six.[8]  So, by the
time the case went to trial, the government was alleging that the
title company was located simply in New Hampshire, rather than in
any particular municipality.  Trainor does not otherwise contest
the sufficiency of the government's proof on counts five and six.

(2) Trainor claims perjury by three government witnesses:
Lee, Smith, and Leslie Ogden, an attorney who handled the loan
closing on 12 Trainor Road for the title company.  But, as
discussed supra notes 2 and 4, Trainor has come forward with
nothing to show that the challenged aspects of Smith's or Ogden's

---

[8]Based on the same incorrect view of these charges, Trainor
argues his "actual innocence" of them.  Insofar as this argument
is offered to excuse the procedural default of Trainor's claims,
then, it likewise cannot prevail.

testimony were false.  So these allegations "fall far short of showing that the witnesses in question perjured themselves, much less that the government knowingly allowed them to do so." United States v. Casas, 425 F.3d 23, 45 (1st Cir. 2005).  And, while Lee's testimony differed from Jones's on one point, supra note 3, such a conflict in the evidence is a matter for the jury, not a constitutional violation arising from the knowing use of perjury to convict.  See id.

Because Trainor has failed to excuse the procedural default of his challenges to the sufficiency of the government's evidence on counts five and six or the testimony of certain witnesses, those claims can be dismissed without an evidentiary hearing. See Porcaro v. United States, 784 F.2d 38, 43 (1st Cir. 1984).

## II.  <u>Ineffective Assistance of Counsel</u>

Trainor claims that his attorneys made a number of errors of constitutional magnitude in preparing for his defense, and defending him, at trial.  These claims fall into roughly seven categories: (A) failure to challenge the underlying debt from Trainor to Jones that served as the basis of the transfer of 16 Trainor Road to Lee; (B) failure to explore agency theories that would have, in Trainor's view, cast these dealings in a less culpable light; (C) failure to challenge what Trainor sees as

Lee's implication of other bad acts to him; (D) failure to use a
professional investigator before trial; (E) failure to challenge
the government's theory that Trainor's crimes were motivated by
greed; (F) failure to challenge a number of the allegations in
the indictment; and (G) failure to challenge purported
deficiencies in the indictment.

To prevail on a claim of ineffective assistance, a
petitioner must show both that counsel's "representation fell
below an objective standard of reasonableness" and "a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different." Strickland
v. Washington, 466 U.S. 668, 687–94 (1984).  None of Trainor's
ineffective assistance claims satisfies either of these criteria.

(A)  Trainor argues that his trial counsel should have, by
examining Lee and Jones and calling a number of other witnesses,
challenged the debt from Trainor to Jones that, Lee and Jones
testified, served as the basis of the transfer of 16 Trainor Road
to Lee's law practice.  As discussed supra, however, defense
counsel steered clear of this subject for fear of opening the
door to an unflattering version of how the debt arose, namely,
that Trainor had misappropriated Jones's investments.[9]  As also

---

[9]Trainor claims that the testimony and witnesses overlooked
by his lawyers would have demonstrated otherwise, even that it

discussed <u>supra</u>, Trainor himself never questioned the validity of the debt when he was confronted by Lee and Jones for transferring the property back, but instead attempted to justify his actions by suggesting that Lee had failed to pay real estate taxes.

In examining Lee and Jones, then, defense counsel chose to explore that theory, rather than the substantially more problematic one that Trainor did not owe Jones any money.  This was a reasonable tactical decision--indeed, counsel was able to get Lee to admit that he did not know whether the taxes had in fact been paid--not ineffective assistance.  <u>See</u> <u>Horton v. Allen</u>, 370 F.3d 75, 86-87 (1st Cir. 2004) (ruling that defense counsel had not been ineffective in not calling alibi witnesses whose testimony would have conflicted with defendant's own version of events); <u>Lema v. United States</u>, 987 F.2d 48, 54 (1st Cir. 1993) (ruling that defense counsel had not been ineffective in not

_____

was Jones, not Trainor, who had done the misappropriating.  But the proffered evidence--which consists largely of Trainor's representations "on information and belief" as to what various witnesses would say on aspects of his business dealings with Jones, accompanied by various documents the significance of which is not readily apparent--does not call Trainor's malfeasance in those dealings into serious doubt.  Aside from the largely unverified nature of this material, Trainor admitted to misappropriating Jones's investments in pleading guilty to tax evasion in another case and, in any event, Trainor's claim that Jones was the wrongdoer was contrary to the explanations he and Lee received from Trainor for re-transferring the parcel.

calling witnesses who would offer both exculpatory and inculpatory testimony).

Furthermore, assuming that the proffered testimony could have clouded the issue of whether Trainor owed money to Jones, but see note 8, infra, Trainor does not explain how the government's case of wire fraud arising out of the transfers of 16 Trainor Road to and from Lee would have suffered as a result. The record still would have shown that Trainor transferred the parcel from Lee by falsely claiming to be his agent, and without any notice whatsoever to Lee or Jones as to what was happening, which is sufficient to prove the "scheme to defraud" essential to a wire fraud conviction.  See, e.g., United States v. Pimental, 380 F.3d 575, 585 (1st Cir. 2004) ("In order to find a 'scheme to defraud,' the jury simply had to determine that [the defendant] was attempting to wrong one in his property rights by dishonest methods or schemes.") (internal quotation marks and bracketing omitted).  Accordingly, Trainor has failed to show a reasonable probability that, but for his counsel's alleged errors in failing to introduce the testimony in question, the jury would have found differently on that charge.[10]  See Horton, 370 F.3d at 87

_____

[10]The same is true of Trainor's analogous claim that counsel erred by failing to call Bill Ewell to testify as to Carol's investment in the development of 16 Trainor Road.  At most, the proffered testimony would have contradicted Smith's story that

(rejecting ineffective assistance claim where counsel's failure to produce witnesses would not have influenced outcome).

(B) Relatedly, Trainor faults trial counsel for not putting in evidence to support an "apparent authority" theory, particularly the testimony of Lee's wife and office manager, Kelly. On this theory, as Trainor sees it, he legitimately acted as the "apparent agent" of Lee's law practice in "rescinding" the transfer of 16 Trainor Road.[11] The doctrine of apparent authority, however, binds a principal to third parties for the actions of an agent in accordance with the principal's manifestations to those third parties, Restatement (Second) of Agency § 8 (1958); it does not bind a principal to the actions of a third party who, by claiming to act as an agent without any authorization at all from the principal, self-deals in his

---

the $20,000 in loan proceeds directed to him was intended as a return of his deposit; it would not have undermined the government's case that Trainor procured the loan as part of a fraudulent scheme to enrich himself. In any event, Trainor offers nothing beyond speculation that supports his version of how Ewell would have testified, see note 5, supra.

[11]Trainor does not claim that Kelly Lee would have contradicted her husband's testimony that he had not authorized Trainor to act as his agent; instead, he speculates that her testimony as to her own authorization to handle certain aspects of the paperwork for 16 Trainor Road–which, it should be noted, never included signing any documents as "agent for the parties," like Trainor did–would have somehow supported the notion that Trainor had similar authorization.

property, as the evidence showed Trainor had done by transferring 16 Trainor Road to his son from Lee's law office based on documents Trainor signed in his purported capacity as "agent for the parties."  See id. § 201A, cmt. b (noting that an agent who holds title to the principal's property in that capacity cannot effectively transfer it to a third party who has knowledge of the agency relationship).

Trainor further complains that his trial counsel should have developed the theory that Lee was acting as the agent to Jones, "an undisclosed principal," in the 16 Trainor Road transaction in order to evade judicial oversight that a Nevada court had imposed over Jones's assets.  But, as the government points out, this theory provides Trainor with no legitimate reason for re-transferring the parcel from Lee without his knowledge.[12] Because Trainor's "agency" theories are so far off the mark, counsel could neither have acted unreasonably nor hurt Trainor's defense by not raising them.  See, e.g., Veiux v. Pepe, 184 F.3d

---

[12]Trainor seems to suggest that, because, on this theory, the purpose of the transaction was to defraud a court, he was somehow justified in undoing the deal afterwards.  Like a number of Trainor's other attempts to explain his actions, however, this theory--assuming it has even the slightest merit--conflicts with the contemporaneous explanations Trainor gave to Lee and Jones, and implicates Trainor in another fraudulent scheme.  Counsel cannot possibly be criticized for staying away from it.

59, 64 (1st Cir. 2001) ("failing to pursue a futile tactic does not amount to constitutional ineffectiveness").

(C)  Trainor argues that counsel erred by failing to challenge testimony that he sees as having implicated other bad acts to him:  Lee's statement that he did not believe Trainor would receive any profit from their 16 Trainor Road deal, "particularly because of the way that Mr. Trainor had got the seven million dollars" from Jones.  Insofar as Trainor suggests his counsel should have explored that subject further with Lee, that claim has already been rejected.  See Part II.A, supra.

Insofar as Trainor suggests his counsel should have moved the court to strike or to order the jury to disregard the testimony, it is common for defense attorneys to eschew such measures for fear that they serve only to call undue attention to potentially harmful testimony.  See, e.g., United States v. Diaz, 494 F.3d 221, 224–25 & n.3 (1st Cir. 2007); United States v. DesMarais, 938 F.2d 347, 350 (1st Cir. 1991).  This is a particularly sound strategy where, as here, the testimony is limited to only the most isolated and indirect reference to prejudicial matter.  For this reason, in fact, even if counsel could be said to have been ineffective in failing to object to the testimony, that error could not possibly have hurt Trainor.  See, e.g., Diaz, 494 F.3d at 227 (upholding denial of mistrial

21

motion based on prosecution witness's isolated statement that defendant had entered the United States illegally).

(D)   Trainor complains that, instead of taking advantage of this court's authorization of investigative services on his behalf to hire a professional investigator, his trial attorneys used that authorization to cover the expenses of conducting the investigation themselves.  As a result, Trainor alleges, the investigation failed to turn up exculpatory evidence, but he provides no details as to what that evidence might have been or, for that matter, how a professional investigator would have found it when counsel did not.[13]  Trainor's claim that counsel rendered ineffective assistance by entrusting the pre-trial investigation to themselves is without merit.  <u>See</u>, <u>e.g.</u>, <u>Lema</u>, 987 F.2d at 55 (ruling that counsel had not been ineffective in failing to interview potential witnesses whose testimony would not have aided and might have hurt the defendant's case).

(E)   Trainor also faults his lawyers for failing to challenge the government's theory that greed had motivated his crimes, arguing that they should have introduced evidence of what he portrays as various humanitarian efforts on his part.  Because

---

[13]Insofar as Trainor suggests that the evidence consists of the testimony and documents he faults counsel for not using to challenge the debt to Jones, that claim fails for the reasons articulated in Part II.A, <u>supra</u>.

these efforts have no apparent connection to the transactions at
issue in Trainor's case, however, this evidence could have been
received, if at all, only as character evidence, _i.e._, to show
that Trainor is not generally a greedy person.  Opening the door
to evidence of Trainor's character would have been disastrous,
given his highly checkered past.  Trainor has been previously
convicted on multiple occasions, including for crimes of
dishonesty.  Indeed, even one of the documents that Trainor
argues should have been introduced, a 1996 letter from the
administrator of a charity, makes reference to the fact that
Trainor "is about to stand trial" on unrelated charges and
alludes to other misconduct by him against the charity itself.
Counsel's judgment in steering clear of the entire issue of
Trainor's character cannot be questioned; the introduction of
that subject at trial would have done far more harm than good.

     (F)  Trainor also accuses trial counsel of failing to
challenge a number of the allegations in the indictment,
particularly those alleging overt acts in furtherance of the
conspiracy.  Yet much of Trainor's argument in support of this
claim simply disputes the government's evidence of these
allegations, rather than identifying what trial counsel failed to
do to contest them.  Because the sufficiency of the government's
conspiracy case has already been upheld on Trainor's direct

appeal from his conviction, however, the issue cannot be
relitigated through a § 2255 motion, see Murchu v. United States,
926 F.2d 50, 55 (1st Cir. 1991), despite Trainor's attempt to
recharacterize the issue as ineffective assistance of counsel,
see Tracey v. United States, 739 F.2d 679, 682 (1st Cir. 1984).
Insofar as Trainor identifies particular evidence he says should
have been introduced to rebut the government's allegations, that
evidence--or, more accurately, Trainor's representations as to
what that evidence would be--has already been discussed in the
context of Trainor's other claims.  This ineffective assistance
of counsel theory has no merit.

(G)  Finally, Trainor claims that counsel failed to
challenge what he calls "flaws in the indictment" that prejudiced
his defense, particularly the alleged "failure to particularize"
the nature of the illegal conduct underlying the wire fraud
counts.[14]  The indictment, however, describes the actions of

---

[14]Trainor also asserts, without explanation, that the
"flaws" in the indictment amounted to a violation of his Fourth,
Fifth, and Sixth Amendment rights.  It is difficult to understand
how the substance of an indictment can violate any rights of the
accused under the Fourth Amendment, which guarantees against
unreasonable searches and seizures, or the Sixth Amendment, which
guarantees a speedy and public trial by an impartial jury, the
confrontation of adverse witnesses, compulsory process, and
counsel.  And, while some of the protections of the Fifth
Amendment do extend to indictments--requiring them for felonies,
preventing double jeopardy, and ensuring due process--Trainor
does not hint at how the indictment may have violated any of

Trainor and his co-defendants in substantial detail in setting forth the conspiracy count, then simply realleges and reincorporates those allegations in each of the wire fraud counts.  This is a common method of pleading both civil and criminal cases.  It does not run afoul of the constitutional requirements for an indictment.  See Hamling v. United States, 418 U.S. 87, 117 (1974).  Counsel was correct not to challenge the indictment on this basis (though, it should be noted, they did challenge it on others, albeit unsuccessfully).

## Conclusion

For the foregoing reasons, Trainor's motion to vacate (document no. 1) is DENIED.  Trainor received the able assistance of counsel throughout the trial and pre-trial processes in this court.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

Joseph A. DiClerico, Jr.
United States District Judge

July 24, 2008

cc:  Jack B. Patrick, Esquire
     William P. Trainor, pro se

---

these guarantees, save for his claim that it failed to allege his illegal conduct with the requisite specificity.

25